# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATALIN HORVATH,<br><br>　　　　Petitioner,<br><br>　v.<br><br>INS,<br><br>　　　　Respondent. | 1:05-cv-00041-REC-TAG-HC<br><br>ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT ORDER RESPONDENT TO PROVIDE PETITIONER WITH AN INTERPRETER FLUENT IN HUNGARIAN |

Petitioner, currently in the custody of the Bureau of Immigration and Customs Enforcement ("ICE") and proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, on January 10, 2005. (Doc. 1).

**PROCEDURAL BACKGROUND**

In her petition, Petitioner maintains that she has been living in the United States for sixteen years and is a legal permanent resident. (Doc. 1, Statement of Facts ("SOF")). Petitioner alleges that she is married to an American citizen and has had one child with her husband. (Id.). She alleges that, following her convictions for several criminal offenses, a final order of removal was entered against her on June 10, 2004. (Id.). She alleges that she was first detained by ICE at the Lerdo Detention Facility in Kern County, California, on August 20, 2004, and has been detained at that facility ever since. (Id.). Petitioner asserts that, after her arrival in this country, she discovered that, despite documents indicating she was born in Hungary, she was actually

born in Russia, orphaned, and then adopted at the age of five by stepparents who raised her in Hungary. (<u>Id</u>.). At the time she filed her petition, Petitioner claimed that she had been incarcerated almost six months, that detention beyond six months was illegal, and that "INS" could not remove her to Hungary since she was born in Russia. (<u>Id</u>.).

On March 29, 2005, the Court issued an order to Respondent to show cause why the petition should not be granted. (Doc. 18). In that order, the Court directed Respondent to lodge Petitioner's "alien file" with the Court as part of its response. (<u>Id</u>.). On July 12, 2005, Respondent filed its response, contending that Petitioner's continued detention was proper because she had failed to cooperate with Respondent "in the obtainment of her travel document" required to effect her removal to Hungary. (Doc. 36, p. 5). Respondent filed Petitioner's alien file on September 30, 2005. (Doc. 47).

In response, Petitioner filed several documents countering Respondent's contentions as well as the information contained in her alien file. (Docs. 48, 49). In those documents, Petitioner makes various allegations related to the accuracy of some documents in her alien file (Doc. 49, pp. 1-9), the likelihood of her being successfully removed to Hungary (<u>id</u>. at pp. 14-18, 23), the omission of information from her alien file (<u>id.</u> at p. 19-20), and her continued protestation that she has cooperated with ICE but cannot speak Hungarian and will not sign documents written in Hungarian without the aid of an interpreter. (<u>Id</u>. at p. 9-12).

## **DISCUSSION**

In the instant case, Petitioner alleges that her mandatory and indefinite detention by ICE is in violation of the Fifth Amendment of the U.S. Constitution and in violation of Respondent's statutory authority. This issue was addressed by the United States Supreme Court in <u>Zadvydas v. Davis</u>, 533 U.S. 678, 121 S.Ct. 2491 (2001).

In <u>Zadvydas</u>, the Supreme Court held that the Immigration and Nationality Act's ("INA") post-removal-period detention statute does not permit indefinite detention, but instead "implicitly limits an alien's detention to a period reasonably necessary to bring about that alien's removal from the United States." <u>Id</u> at 689. The Supreme Court, attempting to limit those occasions when the federal court would need to make such "difficult judgments," set a "presumptively

reasonable period of detention" of six months. Id. at 701. The burden is on the alien to show that there is no reasonable likelihood of repatriation. Id. ("This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."). After six months, and once an alien makes a showing that there is no "significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Id.

In Zadvydas, the aliens were detained by ICE pursuant to 8 U.S.C. § 1231(a)(6), which provides that certain classes of aliens, including those removable due to criminal convictions and those deemed a risk to the community, may be detained beyond the standard ninety-day period. See id. at 682. By contrast, Petitioner appears to be held by ICE pursuant to 8 U.S.C. § 1231(a)(1)(C), which provides as follows:

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period *if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure* or conspires or acts to prevent the alien's removal subject to an order of removal. (Emphasis supplied).

The Ninth Circuit has held that § 1231(a)(1)(C) does *not* present the same constitutional concerns as § 1231(a)(6), because the risk of indefinite detention that motivated the Supreme Court's statutory interpretation in Zadvydas does not exist when an alien is the cause of his or her own detention. Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003). In Pelich, petitioner, a native of Poland, legally entered the United States as a refugee, but was later convicted of felony embezzlement and detained by INS upon his release from prison. Id. at 1057. When the INS attempted to effect Pelich's removal to Poland, the Polish consulate supplied a passport application to enable the consulate to determine whether Pelich was eligible for Polish travel documents. Id. Pelich repeatedly refused to complete the Polish passport application because he claimed his parents were German and therefore he was not a Polish citizen. Id.

The Ninth Circuit held that Pelich "could not squeeze his case into the confines of Zadvydas." Id. at 1059. "Unlike the aliens in Zadvydas, Pelich has the 'keys [to his freedom] in

3

his pocket' and could likely effectuate his removal by providing the information requested by the INS." Id. at 1060. Thus, the Ninth Circuit concluded that a petitioner who impedes removal efforts "has not met his burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future." Id.

Similarly, in Lema v. INS, 341 F.3d 853 (9th Cir. 2003), the Ninth Circuit held that "when an alien refuses to cooperate fully and honestly with officials to secure travel documents from a foreign government, the alien cannot meet his or her burden to show there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 856. Lema was an Ethiopian national detained by INS as an alien removable under 8 U.S.C. § 1227(a)(2)(A)(iii), for having been convicted of an aggravated felony (delivering cocaine). Id. at 854. After the immigration judge issued a final order of removal, Lema applied for travel documents from the Ethiopian Embassy, but, in so doing, claimed he was actually from Eritrea, not Ethiopia. Id. at 855. Based upon this misrepresentation, Ethiopian officials refused to grant him travel documents. Id. Citing Pelich, the Ninth Circuit upheld the district court's denial of Lema's habeas corpus petition based upon his failure to cooperate in the securing of travel documents from Ethiopia. Id. at 856. The Court explained its reasoning as follows:

> We cannot know whether an alien's removal is a "remote possibility," Zadvydas, 533 U.S. at 690, 121 S.Ct. 2491, until the alien makes a full and honest effort to secure travel documents. A particular alien may have a very good chance of being removed, but if that alien is refusing to cooperate fully with officials to secure travel documents, neither the INS nor a court can sensibly ascertain the alien's chance of removal.

Id. at 857.

In other words, an alien who impedes efforts to remove him has not met his burden of showing there is no significant likelihood of removal in the reasonably foreseeable future, and the petition for writ of habeas corpus must therefore be denied. Id. at 857; Pelich, 341 F.3d at 1060.

In the instant case, Petitioner has been in ICE custody following a final order of removal since August 20, 2004. Petitioner's alien file indicates that ICE representatives have presented Petitioner with two forms from the Hungarian Consulate that must be completed. The first is an application for the Certificate of Returning Home, a one-page document printed in both English

4

1  and Hungarian (Doc. 47, p. 175); the second is a five-page document for biographical
2  information and is printed only in Hungarian. (Doc. 47, pp. 176; 191-192; ).  Benito Pangelinan,
3  a deportation officer with ICE, indicated that on two occasions---November 4, 2004 and March
4  18, 2005---Petitioner filled out the application for Certificate of Returning Home with
5  information Pangelinan believed was false, including Petitioner's averment that she was Russian,
6  not Hungarian, that she was not a citizen of Hungary, and that she could not recall her maiden
7  name. (Id. at pp. 192; 217).  Petitioner refused to fill out the biographical information form,
8  contending that she does not speak or read Hungarian. (Id.).   On both occasions Petitioner was
9  served with a copy of Department of Homeland Security Form I-229(a), documenting what
10 Respondent considers a refusal to cooperate in the removal process. (Doc. 47, pp. 202; 221).

11       On November 19, 2004, the Hungarian Consulate issued a letter stating that it would not
12 issue travel documents to Petitioner based on the information she had provided.  (Id. at p. 192).
13 The Consulate requested that the biographical information form Petitioner had refused to fill out
14 be completed before further action could be taken. (Id. at p. 198).  On December 14, 2004, the
15 Hungarian Consulate issued a letter to ICE confirming that the form is only available, and must
16 be completed, in Hungarian. (Id. at p. 228).  The Consul indicated that this was so because "the
17 process takes place in Hungary, where the official language is Hungarian."  (Id.).   The Consul
18 suggested that Petitioner be provided with the services of a translator "so that we can start the
19 process as soon as possible." (Id.).

20       From the foregoing, it is clear that the central issue regarding Petitioner's ongoing
21 detention is whether she is truthfully unable to comprehend Hungarian, and thus to complete the
22 biographical information form required by the Hungarian Consulate, or whether in fact does
23 comprehend Hungarian but is intentionally undermining ICE efforts to effect her removal.

24       In the Court's view, the issue can be resolved by providing Petitioner with the services of
25 an interpreter who speaks and writes Hungarian and who would therefore be able to translate into
26 English the biographical information form, to communicate the contents of the form to
27 Petitioner, and then to complete the form in Hungarian using biographical information supplied
28 by Petitioner.

In dealing with an analogous situation in Pelich, the Ninth Circuit observed:

> If Pelich fills out the application, it's denied and the INS still won't let him go, we would have a different case; we'd also have a different case if Pelich, in good faith, fills out the application to the best of his ability, yet the INS (without cause) claims it's not good enough and thus won't submit it to Poland or tries to force him to include information he maintains is false. We do not have to get into these more challenging questions because the best way to find out whether Pelich is, in fact, Polish, is to send a completed passport application to Poland and see what the Polish authorities say...."

Pelich, 329 F.3d at 1061 fn. 3.

For these reasons, the Court is of the view that the best way to determine whether Petitioner is refusing to cooperate with ICE and also to move the removal process forward in order to assess the likelihood that she can be successfully removed to Hungary, is to provide her with the services of a competent interpreter of Hungarian so that Petitioner may complete the forms required by the Hungarian Consulate.

## ORDER

Accordingly, the Court HEREBY ORDERS that the parties are GRANTED THIRTY (30) days from the date of service of this Order, to SHOW CAUSE why the Court should not issue an order requiring Respondent, at its own expense, to provide Petitioner with a interpreter fluent in Hungarian to assist Petitioner in completing the documents necessary to effect her removal from the United States.[1]

IT IS SO ORDERED.

**Dated:   October 27, 2005**                    **/s/ Theresa A. Goldner**
j6eb3d                                           UNITED STATES MAGISTRATE JUDGE

---

[1] The Court notes that the List of Certified Court Interpreters of Designated Languages, maintained by the California Judicial Council, includes seven individuals who are certified as interpreters of Hungarian. Any order issued by the Court in this regard would require that the interpreter assist Petitioner in completing the previously uncompleted forms provided by the Hungarian Consulate and also that, at the conclusion of this process, the interpreter provide the Court with an English translation of the form and Petitioner's answers. This would be necessary in order for the Court to accurately assess the critical question of whether Petitioner has fully cooperated with ICE in effecting her removal by supplying reasonable and accurate information for the interpreter to use in completing the form.